1  Matthew C. Maclear (Bar No. 209228)
   Jason Flanders (Bar No. 238007)
2  AQUA TERRA AERIS LAW GROUP
   7425 Fairmount Ave.
3  El Cerrito, CA 94530
   Phone: 415-568-5200
4  Emails:
   mcm@atalawgroup.com
5  jrf@atalawgroup.com

6  Attorneys for Plaintiffs
7  COMMUNITY HEALTH WATCH and
   GLOBAL COMMUNITY MONITOR

8                UNITED STATES DISTRICT COURT

9               EASTERN DISTRICT OF CALIFORNIA

10                   SACRAMENTO DIVISION

11

12  COMMUNITY HEALTH WATCH, a California          Civil Case No.:
    unincorporated association; GLOBAL
13  COMMUNITY MONITOR, a California non-profit    COMPLAINT FOR DECLARATORY
    corporation,                                  AND INJUNCTIVE RELIEF AND
14                                                 CIVIL PENALTIES
15              Plaintiffs,                        (Federal Water Pollution Control Act,
                                                   33 U.S.C. §§ 1251 *et seq.*; California
16       v.                                        Health and Safety Code §§ 25249.5 *et
                                                   seq.*)
17  COLLINS PINE COMPANY, a Oregon
    corporation; and DOES 1-25
18
19              Defendants.

20

21

22

23

24

25

26

27

28

Community Health Watch ("CHW") and Global Community Monitor ("GCM") (collectively, "Plaintiffs"), by and through their counsel, hereby allege:

## I.        JURISDICTION AND VENUE

1.        This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.        This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are related to the federal law claims and form part of the same case or controversy.  Such state law claims include a claim under California Health & Safety Code §§ 25249.5 *et seq.*, the Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65").

3.        On 4 November 2014, Plaintiffs issued a 60-day notice letter under the Clean Water Act ("CWA Notice Letter") to Collins Pine Company, Collins Timber Company, The Collins Companies, and Corporation Service Company, an agent for service of process. The CWA Notice Letter informed Defendants of their violations of the Clean Water Act at the Collins Pine Company Chester Sawmill and Steam Power Electric-Generating Biomass Conversion facility located at 500 Main Street, Chester, CA 96020 ("CPC Facility"), and of Plaintiffs' intention to file suit against Defendants.

4.        The CWA Notice Letter was sent to the registered agent for Defendants Collins Timber Company and Collins Pine Company, and to the owners and operators of the CPC Facility, as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region, ("Regional Board") as required by section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The CWA Notice Letter is attached hereto as **Exhibit A** and is incorporated herein by reference, as though fully set forth.

5.        More than sixty days have passed since the CWA Notice Letter was served on the Defendants, Corporation Service Company, and the State and Federal agencies.

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                2                ATA Law Group
                                                        www.atalawgroup.com

6.      Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the CWA Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

7.      On 4 November 2014, Plaintiffs issued a 60-day notice of violation and intent to sue letter under Proposition 65 ("Prop. 65 Notice Letter") to Defendants, Corporation Service Company, and the Attorney General and District Attorneys for Plumas, Butte, Sacramento, Sutter, Yolo and Yuba Counties ("public prosecutors").  The Prop. 65 Notice Letter informed Defendants of their violations of Proposition 65 at the CPC Facility, and of Plaintiffs' intention to file suit against Defendants. Each Prop. 65 Notice Letter included a Certificate of Service by Mail and a document entitled "The State Drinking Water & Toxic Enforcement Act of 1986 (Proposition 65) A Summary," Health and Safety Code § 25249.7(d), except for the Prop. 65 Notice Letter which was submitted electronically to the Attorney General. The Prop. 65 Notice Letter is attached hereto as **Exhibit B** and is incorporated herein by reference, as though fully set forth.

8.      More than sixty days have passed since the Prop. 65 Notice Letter was served on the Defendants, Corporation Service Company, and the public prosecutors.

9.      Plaintiffs are informed and believe, and thereon allege, that neither the State of California nor any public prosecutor has commenced or is diligently prosecuting an action to redress the violations alleged in the Prop 65 Notice Letter and in this complaint. This action is not barred by any prior administrative penalty action or any filed and diligently prosecuted action.

10.      Venue is proper in the Eastern District of California pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

11.      Plaintiffs seek relief from Defendants' violations of the procedural and substantive requirements of the California Central Valley Regional Water Quality Control Board's *National Pollution Discharge Elimination System Permit No. CA0004391, as amended by Waste Discharge Requirements for the Collins Pine Company Chester Sawmill Plumas County Order No. R5-2009-0015* ("NPDES Permit") and the California State Water Resources Control Board's *Water Quality Order No. 97-03-DWQ, National Pollution Discharge Elimination System General Permit No. CAS000001, as*

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                                        3                          ATA Law Group
                                                                                      www.atalawgroup.com

1    *amended by Order No. 92-12-DWQ, Waste Discharge Requirements for Discharges of Storm Water*

2    *Associated with Industrial Activities Excluding Construction Activities* ("Storm Water Permit").

3        12.    Plaintiffs also seek injunctive and declaratory relief and civil penalties from Defendants'

4    violations of the procedural and substantive requirements of section 301(a) of the Clean Water Act, 33

5    U.S.C. § 1311(a) and Proposition 65 (California Health & Safety Code §§ 25249.5 *et seq.*).

6    **II.    INTRADISTRICT ASSIGNMENT**

7        13.    Pursuant to Local Rule 120(d), intradistrict assignment of this matter to the Sacramento

8    or Redding Divisions of the Court is appropriate in that the events or omissions which give rise to

9    Plaintiffs' claims occurred in Plumas County.

10   **III.    PARTIES**

11        **A.    Plaintiffs Community Health Watch and Global Community Monitor**

12        14.    CHW is an unincorporated citizen group located in Chester, California. The mission and

13   focus of CHW is to protect the combined social, health, environmental and cultural conditions that

14   influence individuals and the community in the Chester and Lake Almanor area of Plumas County,

15   California ("Lake Almanor Basin"). CHW has approximately seven active members and forty associate

16   members who use and enjoy the waters of the Almanor Basin, such as Lake Almanor, the North Fork

17   Feather River, and their tributaries, and other area waters for various recreational, educational, spiritual

18   and aesthetic benefits and purposes.

19        15.    GCM is a non-profit public benefit corporation organized under the laws of California,

20   with offices in Richmond, California. GCM's purpose and mission is to protect the global environment

21   through education, community mobilizing, and training and support in the use of environmental

22   monitoring tools to understand the impact of discharged pollutants on their health and the environment.

23   This work focuses on disempowered communities harmed by serious air and water pollution from

24   industrial sources, concerns responsible corporations are ignoring. GCM has a staff of four, an eight

25   member Board of Directors, and works with community members and groups throughout the world. On

26   occasion, GCM directly initiates enforcement actions on behalf of itself and community groups it has

27   educated, trained, and supported in the use of environmental monitoring tools. Over the past few

28   months, GCM has educated, trained, and supported the citizens of Chester, California and CHW in their

---

Complaint for Declaratory and Injunctive Relief          4          ATA Law Group
and Civil Penalties                                                  www.atalawgroup.com

1   efforts to monitor and clean up pollution in the Lake Almanor Basin. GCM has members within the

2   Lake Almanor Basin.

3       16.     Plaintiffs' members use and enjoy the waters of the Lake Almanor, the North Fork

4   Feather River, and their tributaries (collectively, "Receiving Waters") impacted by the CPC Facility.

5   CHW and GCM members use and enjoy some or all the Receiving Waters for fishing, boating,

6   swimming, bird watching, picnicking, viewing wildlife, and engaging in spiritual and aesthetic pursuits.

7       17.     Defendants' failure to comply with the procedural and substantive requirements of the

8   NPDES and Storm Water Permits, the Clean Water Act, and Proposition 65, including but not limited to

9   Defendants' discharge of polluted process wastewater, storm water, non-storm water, and the emission,

10  release, discharge, deposition, disposal and discard of ash from the CPC Facility, negatively impacts and

11  impairs Plaintiffs' members' use and enjoyment of these waters.

12      18.     The interests of Plaintiffs' members have been, are being, and will continue to be

13  adversely affected by Defendants' failure to comply with the Clean Water Act, Proposition 65, and the

14  NPDES and Storm Water Permits. The relief sought herein will redress the harms to Plaintiffs caused by

15  Defendants' activities.

16      19.     Continuing commission of the acts and omissions alleged herein have irreparably harmed

17  and will irreparably harm Plaintiffs' members, for which harm they have no plain, speedy, or adequate

18  remedy at law.

19      20.     Plaintiffs also bring this action in the public interest, pursuant to Health & Safety Code §

20  25249.7 (d).

21  **B.      The Owners and Operators of the CPC Facility**

22      21.     Plaintiffs are informed and believe, and thereon allege, that Collins Pine Company is a

23  corporation formed under the laws of Oregon, and maintains an office at 500 Main Street, Chester, CA

24  96020.

25      22.     Plaintiffs are informed and believe, and thereon allege, that Collins Pine Company is an

26  owner and/or operator of the CPC Facility.

27      23.     Plaintiffs do not know the true names, capacities and liabilities of Defendants DOES Nos.

28  1-25, inclusive, and therefore sues them under fictitious names. Plaintiffs will amend this Complaint to

allege the true name and capacities of the DOE Defendants upon being ascertained.  Each of these Defendants was in some way legally responsible for the acts, omissions and/or violations alleged herein.

24.     Plaintiffs are informed and believe, and thereon allege, that each of the Defendants herein has employed ten or more persons at all times relevant to this action, and thus each is a "person in the course of doing business" within the meaning of Proposition 65. Health and Safety Code § 25249.11(b).

25.     When, in this Complaint, reference is made to any act of the Defendants or of the CPC Facility, such shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such acts, or failed and omitted to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of the Defendants, and did so while acting within the scope of their employment or agency.

26.     In this Complaint, when reference is made to any act of a Defendant, such allegation shall mean that the owners, officers, directors, agents, employees, contractors, or representatives of Defendant(s) did or authorized such acts, or negligently failed and omitted to act or adequately and properly supervise, control or direct its employees and agents while engaged in the management, direction, operation or control of the affairs of the CPC Facility and related operations. Whenever in this complaint reference is made to any act of any Defendant, such allegation shall be deemed to mean the act of each Defendant acting individually, jointly and/or severally.

## IV.   LEGAL FRAMEWORK

### A.   The Clean Water Act

27.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

28.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. NPDES permits include both general permits, which are issued under 40 C.F.R.

1   § 122.28, authorizing a category of discharges under the CWA within a geographical area, and

2   individual permits, which are issued to specific facilities.

3       29.    NPDES permits must include conditions that will ensure compliance with the CWA. At a

4   minimum, NPDES permits must include technology-based effluent limitations, any more stringent

5   limitations necessary to meet water quality standards, and monitoring and reporting requirements. See

6   33 U.S.C. §§ 1342, 1311, 1318.

7       30.    CWA § 402 requires each discharger to meet minimum technology-based treatment

8   requirements. Section 402 states that all permits must meet all applicable requirements under CWA §

9   301. 33 U.S.C. § 1342(a)(1). Section 301, in turn, requires all discharges to achieve, at a minimum, best

10  practicable control technology ("BPT"). 33 U.S.C. § 1311(b)(1)(a). Discharges of toxic pollutants must

11  be treated pursuant to the best available technology ("BAT"), 33 U.S.C. § 1311 (b)(2)(A), and other

12  pollutant discharges must comply with best conventional technology ("BCT"). 33 U.S.C. §

13  1311(b)(2)(E). Each of these treatment categories is translated into effluent limitations, which must be

14  reflected in permits as restrictions on rates quantities, and concentrations of pollutants.

15      31.    Once regulated by an NPDES permit, discharges must strictly comply with all of the

16  terms and conditions of that permit. Violators are subject to enforcement actions initiated by EPA,

17  states, and citizens. 33 U.S.C. §§ 1319, 1365(a).

18      32.    Section 402(b) of the CWA, 33 U.S.C. § 1342(b), establishes a framework for regulating

19  industrial storm water discharges under the NPDES program. States with approved NPDES permit

20  programs are authorized by section 402(b) to regulate industrial storm water discharges through

21  individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide

22  general NPDES permit applicable to all industrial storm water dischargers. *See* 33 U.S.C. § 1342(b).

23      33.    In California, the State Board is charged with regulating pollutants to protect California's

24  water rights and resources, and the nine Regional Boards are charged with protecting water quality.

25      34.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board

26  pursuant to section 402 of the CWA, 33 U.S.C. § 1342(b), and 40 C.F.R § 123.25.

27      35.    In order to discharge storm water lawfully in California, industrial dischargers must

28  secure coverage under the Storm Water Permit and comply with its terms, as required under the NPDES

Complaint for Declaratory and Injunctive Relief
and Civil Penalties    7    ATA Law Group
www.atalawgroup.com

1   Permit.

2       36.     Violations of the Storm Water Permit are also violations of the CWA, Section C

3   (Standard Provisions).

4       37.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement

5   actions against any "person" who is alleged to be in violation of an "effluent standard or limitation… or

6   an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33

7   U.S.C. §§ 1365(a)(i), 1365(f). Defendants qualify as persons under the CWA.

8       38.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to

9   $37,500 per day for violations occurring after 1 July 2009. 33 U.S.C. § 1319(d); Adjustment of Civil

10  Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

11      39.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or

12  substantially prevailing parties to recover litigation costs, including but not limited to attorneys' fees,

13  experts' fees, and consultants' fees.

14  **B.      The NPDES Permit's Discharge Prohibitions**

15      40.     The CPC Facility's NPDES Permit contains a number of specific discharge prohibitions,

16  including but not limited to:

17          i.    Discharge Prohibition A limits the CPC Facility's discharges to a maximum of 0.36

18                mgd of process wastewater from and through Discharge Point 001.

19          ii.   The NPDES Permit prohibits the discharge of wastewater from at a location or in a

20                manner different from that described in the permit's findings.

21          iii.  Discharge Prohibition B prohibits by-pass or overflow to surface waters except as

22                allowed by narrow Federal Standard Provisions.

23          iv.   Discharge Prohibition C prohibits discharge or treatment that creates a nuisance as

24                defined under the California Water Code.

25          v.    Discharge Prohibition E prohibits the discharge of waste that causes violation of any

26                narrative water quality objective contained in the Basin Plan.

27          vi.   Discharge Prohibition F prohibits the discharge of waste that causes violation of any

28

---

Complaint for Declaratory and Injunctive Relief        8              ATA Law Group
and Civil Penalties                                                   www.atalawgroup.com

of any numeric water quality objective standards contained in the Basin Plan.

    vii.  Discharge Prohibition H prohibits causing pollution as defined by Section 13050 of the Water Code.

    viii.  Discharge Prohibition I prohibits storm water discharges at locations or in manners different from described in the Findings of the NPDES Permit.

    ix.  Discharge Prohibition J prohibits discharge of leachate from wood fuel stockpiles or ash stockpiles to surface waters, surface water drainage courses, or groundwater.

    x.  Discharge Prohibition K prohibits discharge of hazardous or toxic substances, including water treatment chemicals, solvents, or petroleum products to surface waters or groundwater.

    xi.  Discharge Prohibition L prohibits the discharge of ash, bark, wood, debris, or any other wastes recognized as originating from the facility to surface waters or drainage courses.

**C.    The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

41.    The Storm Water Permit contains a number of discharge prohibitions, effluent limitations, and receiving water limitations, including but not limited to:

    i.  Discharge Prohibition (A)(1) of the Storm Water Permit prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States.

    ii.  Discharge Prohibition (A)(2) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

    iii.  Effluent Limitation (B)(1) requires that storm water discharges from facilities subject to storm water effluent limitations guidelines in Federal regulations (40 C.F.R. Subchapter N) shall not exceed the specified effluent limitations.

42.    Effluent limitations set forth at 40 C.F.R. Subchapter N are limitations established by the EPA with which existing point sources of discharges must comply. 40 C.F.R. § 401.10.

43.    Effluent limitations established at 40 C.F.R. §§ 442.1 *et seq.* ("Federal Effluent

1  Limitations") apply to discharges resulting from discharges of the sawmill and biomass conversion,

2  a.k.a. incineration, for the steam power electric generating operations, including but not limited to

3  Standard Industrial Classification ("SIC") codes 2421 and 4911 facilities.

4      44.    Discharges with pollutant levels that exceed 40 C.F.R. Subchapter N effluent limitations

5  are violations of Effluent Limitation (B)(1) of the Storm Water Permit.

6      45.    Effluent Limitation (B)(3) of the Storm Water Permit requires dischargers to reduce or

7  prevent pollutants associated with industrial activity in storm water discharges through the

8  implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-

9  conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional

10  pollutants.

11      46.    EPA Benchmarks are relevant and objective standards to evaluate whether a permittee's

12  BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation B(3) of the

13  Storm Water Permit. *See* General Industrial Storm (adopted 1997), Order, p. 04; Final Reissuance of

14  National Pollutant Discharge Elimination System (NPDES) Storm Water Multi-Sector General Permit

15  for Industrial Activities, 65 Fed. Reg. 64,766 (October 30, 2000).

16      47.    The EPA Benchmark values provide an objective level to determine whether a facility's

17  storm water pollution prevention measures are successfully implemented. *Id*. at 64,766-67.

18      48.    Receiving Water Limitation (C)(1) of the Storm Water Permit prohibits storm water

19  discharges and authorized non-storm water discharges from adversely impacting human health or the

20  environment.

21      49.    Receiving Water Limitation (C)(2) of the Storm Water Permit prohibits storm water

22  discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a

23  Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

24      50.    Water Quality Standards ("WQS") include pollutant concentration levels determined by

25  the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the

26  waters that receive polluted discharges. Discharges above water quality standards contribute to the

27  impairment of the Receiving Waters' beneficial uses.

28      51.    The applicable WQS include, but are not limited to, the Criteria for Priority Toxic

---

Complaint for Declaratory and Injunctive Relief        10                    ATA Law Group
and Civil Penalties                                                          www.atalawgroup.com

Pollutants for the State of California ("California Toxics Rule" or "CTR"), 40 C.F.R. § 131.38.

52.    These numeric criteria are set to protect human health and the environment in the state of California. Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008; April 2000.

53.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable water quality standards are violations of Receiving Water Limitation (C)(2) of the Storm Water Permit.

**D.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

54.    Section A(1) and Provision E(2) of the Storm Water Permit require dischargers to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") that complies with the requirements of the Storm Water Permit by October 1, 1992, or prior to beginning industrial activities.

55.    The objective of the SWPPP is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the CPC Facility, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges.

56.    These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations. To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A(9). The SWPPP must also be revised as necessary to ensure compliance with the Storm Water Permit. *Id.*, Sections A(9) and A(10).

57.    Sections A(3) – A(10) of the Storm Water Permit set forth the requirements for a SWPPP. Among other things, the SWPPP must include: a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system(s), structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity (*see* Section A(4)); a list of significant materials handled and stored at the site (*see* Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities; a description of significant spills and leaks, a list of all non-storm water discharges and their

1  sources; and a description of locations where soil erosion may occur (*see* Section A(6)). Sections A(7)

2  and A(8) require an assessment of potential pollutant sources at the facility and a description of the

3  BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges

4  and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are

5  not effective.

6  **E.     The Storm Water Permit's Monitoring and Reporting Requirements**

7          58.     Provision E(3) and Section B(1) of the Storm Water Permit require dischargers to

8  develop and implement a Monitoring and Reporting Program ("M&RP") prior to commencing industrial

9  activities.

10         59.     The primary objective of the M&RP is to detect and measure the concentrations of

11 pollutants in a facility's discharge to ensure compliance with the Storm Water Permit's Discharge

12 Prohibitions, Effluent Limitations, and Receiving Water Limitations.

13         60.     The M&RP aids in the implementation and revision of the SWPPP and measures the

14 effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Section B(2)(c) and

15 B(2)(d).

16         61.     Sections B(3) through B(16) of the Storm Water Permit set forth the M&RP

17 requirements. Sections B(5), B(6), and B(7) of the Storm Water Permit require dischargers to visually

18 observe and collect samples of storm water discharges from all locations where storm water is

19 discharged that represent the quality and quantity of the storm water discharges.

20         62.     The CPC Facility Owners and/or Operators are required to collect samples from each

21 discharge location at the CPC Facility during the first hour of discharge from the first storm event of the

22 wet season, and from all discharge locations during at least one other storm event in the same wet

23 season.

24         63.     Storm water samples shall be analyzed for TSS, pH, specific conductance, total organic

25 carbon or oil and grease, and toxic chemicals and other pollutants – such as copper, a pollutant that the

26 CPC Facility is not testing for – that are likely to be present in significant quantities in the discharges,

27 according to Section B(5)(c). *See* Storm Water Permit, Table D, Sectors A and O. Furthermore,

28 Constituent Studies and a Pollution Prevention Plan for copper and lead were required in the NPDES

1  Permit because of the reasonable potential to cause or contribute to exceedances of water quality

2  objectives and need to establish best management practices to reduce the toxic discharges. Finally, the

3  CPC Facility must test for substances required under the NPDES and Storm Water Permits, and the

4  federal Multi-Sector General Permit and EPA benchmarks listed therein for SIC codes, 2421 and 4911,

5  for the industrial activity in which they engage. *Id.*, Section B(6); 40 C.F.R. §§ 429, 423.

6         **F.**    **The Receiving Waters**

7        64.    Lake Almanor, the North Fork Feather River, their tributaries and adjacent wetlands are

8  ecologically sensitive areas. Although pollution and habitat destruction have diminished the Receiving

9  Water's varied wildlife, these waters are still essential habitat for dozens of fish and bird species as well

10  as macro-invertebrate and invertebrate species. Polluted process wastewater, storm water and non-storm

11  water contaminated with carcinogens, reproductive toxicants, heavy metals and other pollutants harm

12  the wildlife, habitat, people and special aesthetic and recreational significance that Lake Almanor, the

13  North Fork Feather River, and their tributaries have for people in the surrounding communities.

14        65.    The public's usage of the Receiving Waters for contact sports exposes many people to

15  toxic metals and other contaminants from Defendants' polluted discharges. Non-contact recreational and

16  aesthetic opportunities, such as wildlife observation, are also damaged by the illegal contaminated

17  discharges, emissions, deposits, disposals and releases of its process wastewater, storm water, non-storm

18  water and ash.

19        66.    The State Water Resources Control Board *Water Quality Control Plan, Fourth Edition*

20  *(Revised October 2011), for the Sacramento and San Joaquin River Basins* ("Basin Plan") establishes

21  Water Quality Objectives for Inland Surface Waters such as Lake Almanor, the North Fork Feather

22  River, and their tributaries.

23        67.    The Water Quality Objectives require that all applicable waters be maintained free of

24  toxic substances, alone or in combination, in concentrations that produce detrimental physiological

25  responses in human, plant, animal or aquatic life. *See* Basin Plan at III-10.

26        68.    These Water Quality Objectives are intended to protect Beneficial Uses of Surface

27  Waters such as Lake Almanor, the North Fork Feather River, and their tributaries, including municipal

28  drinking water, wildlife habitat, freshwater habitat, and in-water recreation. *See* Basin Plan at Table II-1,

p. II-6.00.

69.     Further, State Water Board Resolution No. 88-63 requires that the Regional Water Board assign the municipal and domestic supply use to water bodies that do not have beneficial uses listed in the Basin Plan.

70.     Under the Basin Plan, the beneficial uses of Lake Almanor, downstream of many of the CPC Facility discharges, are hydropower generation (POW), water contact recreation (REC-1), warm freshwater aquatic habitat (WARM), cold freshwater aquatic habitat (COLD), spawning habitat (SPWN), and wildlife habitat (WILD).

71.     Under the Basin Plan, the beneficial uses of the North Fork Feather River are municipal and domestic water supply (MUN), all recreational uses (REC-1) (REC-2), cold water habitat (COLD), spawning (SPWN), and wildlife habitat (WILD).

72.     The beneficial uses of downstream waters are imputed to upstream tributaries in order to protect the beneficial uses of the downstream waters. Thus, Lake Almanor and its tributaries, including Stover Ditch, have domestic and municipal water supply beneficial uses as their water quality objectives.

73.     All groundwater in the region is considered as suitable or potentially suitable for municipal and domestic water, industrial service and process, and agriculture supply.

74.     The Almanor Watershed Basin Watershed Advisory Committee ("ABWAC"), created in 2005 by the Plumas County Board of Supervisors from a grant from the Department of Water Resources, issued the Lake Almanor Watershed Management Plan ("Management Plan") in April of 2009.

75.     The ABWAC's purpose is to address water quality, land use, and critical habitat issues in the Lake Almanor Basin. The Management Plan identifies three primary goals: 1) Protect, maintain, and improve water quality and riparian and terrestrial habitat in the Lake Almanor Basin; 2) Maintain and improve quality of life in the basin communities; minimize the negative social impacts of development and maximize the benefits; and 3) Establish ongoing investments, restoration, and coordinated management in the watershed. *See* Management Plan at pp. 1, 2.

**G.   Proposition 65**

76.   In 1986, California voters passed the Safe Drinking Water and Toxic Enforcement Act of 1986, more commonly known as Proposition 65 ("Proposition 65" or "Prop. 65"), by nearly a two-to-one margin. (California Health & Safety Code §§ 25249.5 - 25249.13.)

77.   Health and Safety Code § 25249.5 absolutely prohibits any business from contaminating California's drinking water supplies. Section 25249.5 provides:

> No person in the course of doing business shall knowingly
> discharge or release a chemical known to the state to cause
> cancer or reproductive toxicity into water or onto or into land
> where such chemical passes or probably will pass into any
> source of drinking water. . .

78.   Proposition 65 requires the State to publish a list of chemicals known to cause cancer or birth defects or other reproductive harm. Health and Safety Code § 25249.8. This list, which must be updated at least once a year, has grown to include over 800 chemicals since it was first published in 1987.

79.   Under Proposition 65, a "source of drinking water" is defined as a present source of drinking water or water that is identified in a water quality control plan as being suitable for domestic or municipal uses. Health and Safety Code § 25249.11(d). Moreover, "water" is defined to include both surface and groundwater. 27 California Code of Regulations § 25102(w). The State Water Resources Control Board Resolution No. 88-63 states that "[a]ll surface and ground waters of the State are considered to be suitable, or potentially suitable, for municipal or domestic water supply and should be so designated by the Regional Boards." The designated and unequivocally imputed beneficial uses of Stover Ditch and Lake Almanor and the North Fork Feather River include domestic and municipal drinking water supply.

80.   Violations of Proposition 65 may be enforced by any person in the public interest, after providing a 60-day notice of the violations to the Attorney General, appropriate District Attorneys and City Attorneys and the alleged violator. Health and Safety Code § 25249.7(d)(1). Remedies include injunctive relief to prevent actual or threatened violations, and penalties of up to $2,500 per day per violation. Health and Safety Code § 25249.7(a) and (b).

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                                     15                          ATA Law Group
                                                                                   www.atalawgroup.com

81.     California Code of Civil Procedure section 1021.5 permits an award of attorney's fees to a "successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit . . . has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

82.     In a Proposition 65 a discharge case, the reduction or elimination of the discharge of listed chemicals establishes a significant public benefit. (11 California Code of Regulations § 3201(b)(3).)

V.      **FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

83.     Plaintiffs are informed and believe, and thereon allege, that the CPC Facility is an approximately 100 acre sawmill and biomass conversion steam power electricity-generating facility located at 500 Main Street, Chester, CA 96020.

84.     Plaintiffs are informed and believe, and thereon allege, that the CPC facility discharges pollutants to the Stover Ditch a tributary of Lake Almanor and the North Fork Feather River, waters of the United States, from at least six discharge points.

        A.      **The Permits**

85.     CPC facility storm water and wastewater discharges are regulated by at least two permits: the NPDES Permit and the Storm Water Permit.

86.     The CPC Facility's NPDES Permit regulates the CPC Facility's point source discharges consisting of treated process wastewater from the CPC Facility.

87.     The most recent NPDES Permit for the CPC Facility was issued on February 5, 2009 in Order No. R5-2009-0015.

88.     The CPC Facility is allowed to discharge 360,000 gallons per day (or .36 million gallons per day ("mgd")) of effluent originating from industrial operations at the CPC Facility.

89.     On 23 December 2013, Defendants submitted an Application/Report of Waste Discharge General Information Form for Waste Discharge Requirements or NPDES Permit ("Application"), to obtain continuing Individual NPDES Permit coverage.

90.     An Order and Individual Permit to obtain a subsequent NPDES Permit has not been issued, and the 2009 NPDES Permit remains in force.

91.     In 2006, the CPC Facility obtained coverage for the CPC Facility under the current California General Storm Water Permit.

92.     The CPC Facility submitted a revised SWPPP in July 2014 in response to an April 2006 letter and a May 2014 Notice of Violation from the Regional Board.  Between April 2006 and May 2014, the CPC Facility operated under an inadequate SWPPP during that time.

93.     In October 2013, the Regional Board requested that the CPC Facility SWPPP be updated; an updated SWPPP was not completed until 18 July 2014.

94.     On 18 February 2014 during a Regional Board inspection, a sheen on the discharge from the oil/water separator.

95.     The NPDES Permit, subsequent Application, and NOI identify the Owner/Operator of the CPC Facility as "Collins Pine Company" located 500 Main Street, Chester, California 96020.

96.     The NPDES Permit, subsequent Application and Storm Water Permit list the CPC Facility Standard Industrial Classification ("SIC") code of regulated activity as 2421 (*Sawmills and planning mills*), and 4911 (*electric services*) as described in the State Water Resources Control Board Industrial Storm Water General Permit and the USEPA Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity (MSGP).

97.     While CPC designates itself as engaging in "electrical services," under SIC 4911, the Industrial Storm Water General Permit, US Department of Labor and the MSGP list the industrial activity of operating a biomass incinerator creating steam used to generate power, as Defendant does, as "Steam Electric Power Generating Facilities" under 4931 for establishments primarily engaged in providing electric services in combination with other services, with electric services as the major part though less than 95 percent of the total.

   **B.     Industrial Activities and Discharge at the CPC Facility**

98.     Plaintiffs are informed and believe, and thereon allege, that the CPC Facility is a 100-acre site consisting of a softwood lumber sawmill, cogeneration plant, electrical substations, two fresh water ponds, an unlined ash settling pond, three additional unlined recycle ponds, gravel pit, drying kilns,

vehicle operation, maintenance, and cleaning facilities, tank farm, boiler, smoke stack(s), log decks, ash storage area, office building(s), and other associated buildings and areas necessary to operate a sawmill and cogeneration facility.

99.     Plaintiffs are informed and believe, and thereon allege, that CPC Facility consistently violates its significantly high volumetric effluent limit of 360,000 gallons per day.

100.     Plaintiffs are informed and believe, and thereon allege, that sources of pollutants associated with the industrial activities at the CPC Facility include, but are not limited to: outdoor bulk material storage areas, saw logs, wood fuel, tire piles, petroleum fuel, non-biomass conversion (as defined by California Public Resources Code § 40106), steam power electricity generating incinerator/boiler operations, water treatment chemicals, ash piles, vehicle and equipment maintenance areas, parking areas, shipping and receiving areas, and the on-site material handling equipment such as conveyors, forklifts, and trucks.

101.     Plaintiffs are informed and believe, and thereon allege, that wastes generated by the biomass conversion and cogeneration operations include, but are not limited to, ash contaminated with metals, and polluted process wastewater which includes, condenser cooling water, recycled wastewater associated with the log decks, compressor blowdown, electrostatic precipitator wastewater, boiler blowdown, and mud drum blowdown.

102.     Plaintiffs are informed and believe, and thereon allege, that wastes generated by the sawmill operation include wood debris and waste, recycled wastewater associated with wet log storage, hydraulic oil and grease lubricant, and petroleum and other fuel leakage.

103.     Plaintiffs are informed and believe, and thereon allege, that other CPC Facility related waste streams include, but are not limited to, oil/water separator discharge, vehicle wash yard runoff, and polluted process wastewater, contaminated ash, storm water and non-storm water runoff.

104.     Plaintiffs are informed and believe, and thereon allege, the CPC Facility accepts, generates, treats, burns or incinerates non-wood containing materials or wastes such that arsenic, benzene, beryllium, cadmium and cadmium compounds, carbon disulfide, chloroform, cobalt metal powder, Di(2-ethylhexyl)phthalate, dichloromethane (methylene chloride), lead and lead compounds, naphthalene, nickel and certain nickel compounds, residual (heavy) fuel oils, selenium sulfide, soots,

tars and mineral oils (untreated and mildly treated oils and used engine oils), toluene and 4-(N-Nitrosomethylamino)-1-(-3-pyridal)1-butanone (collectively referred to "Listed Chemicals") have appeared in significant amounts in ash, effluent and/or storm water discharges, releases and emissions.

105.    Plaintiffs are informed and believe, and thereon allege, that oil and grease, transmission and vehicle fluids (such as antifreeze and gasoline), metal particles, and other pollutants have been and continue to be tracked throughout the CPC Facility operations area. These pollutants accumulate at the bulk storage areas, the loading and unloading areas, and the parking lot and the driveways areas. As a result of soil amendment applications and normal operations, trucks and vehicles leaving the CPC Facility via staging areas and driveways are pollutant sources tracking sediment, dirt, ash, oil and grease, metal particles, Listed Chemicals and other pollutants off-site.

106.    Plaintiffs are informed and believe, and thereon allege, that specific pollutants associated with operations at the CPC Facility include, but are not limited to: zinc; copper; lead and lead compounds; arsenic, aluminum; iron; oil and grease; fuel and fuel additives; total suspended solids ("TSS"); coolant; pH-affecting substances; chlorine; phosphorous; sulfate; boron; magnesium; manganese; acrylonitrile, benzene and benzene compounds; chloroform, polychlorinated biphenyl ("PCBs"); toluene; vanadium; nickel compounds; other Listed Chemicals; and fugitive and other dust, dirt, and debris.

107.    Plaintiffs are informed and believe, and thereon allege, that the Defendants' failure to properly supervise, address, and monitor known or foreseeable pollutant sources, processes involving pollutants and Listed Chemicals and related activities resulted, and continues to result, in the generation and exposure of pollutants and Prop.65 Listed Chemicals to water, land and air.  And Defendants' acts, omissions or failures to abate the discharge/release of illegally polluted process wastewater, storm water, non-storm water and the emission, discharge, release, deposit, disposal and discard of polluted and contaminated ash to waters, land and air were intentional, willful, and/or knowing.

108.    Plaintiffs are informed and believe, and thereon allege, that the exposure of pollutants and Listed Chemicals, associated with the CPC Facility's industrial activities, results in the discharge, release, emission, deposit, disposal, and discard of contaminated process wastewater, ash, non-storm

water and storm water from the CPC Facility into Receiving Waters in violation of the NPDES Permit, the Storm Water Permit, the Clean Water Act and Proposition 65.

109. Plaintiffs are informed and believe, and thereon allege, that the Defendants' failure to properly address pollutant sources and pollutants also results in prohibited discharges in violation of the Permits, and the Clean Water Act, and/or unpermitted discharges of pollutants in violation of the Clean Water Act and Proposition 65.

110. Plaintiffs are informed and believe, and thereon allege, that other pollutants discharge, release or emission directly to Receiving Waters from biomass conversion cogeneration operations, ash, soil amendments, uncovered bulk material storage and other facility areas. For example, ash and fugitive dust and other pollutants from uncovered bulk material and other storage piles are discharged directly to Receiving Waters or drainage courses via air deposition.

111. Plaintiffs are informed and believe, and thereon allege, that the Defendants' failure to properly perform a Constituent Study for the presence of copper and lead, as required in the NPDES, failed to perform the study in a timely fashion by the deadlines set forth in the NPDES Permit, and/or failed to properly implement the Study from 2010 forward such that there continue to be copper and lead exceedances through the present and continuing.

112. Plaintiffs are informed and believe, and thereon allege, that the CPC Facility is discharging process wastewater in a manners or methods not authorized by its NPDES permit, to wit – during the 18 February 2014 Regional Board inspection, CPC admitted discharging contaminated process wastewater to recycling ponds, gravel pit, ditches/culverts, and ultimately through discharge point EFF-001, all of which were not authorized under the NPDES Permit, incorporated into its flow schematic, nor monitored as required.  Defendant further admitted to diverting process wastewater from the clarifiers and/or the ash ponds to the recycle ponds and discharged to the gravel pit area. Furthermore, these knowing and intentional acts were part of regular quarterly procedures involving the dredging of the ash pond and/or diversion of process wastewater from clarifiers to the log deck, recycling ponds, gravel pit, ditches/culverts and to discharge point EFF-001.

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                              20                    ATA Law Group
                                                                      www.atalawgroup.com

113.    Plaintiffs are informed and believe, and thereon allege, that this wastewater impermissibly commingles with storm water, non-storm water, surface waters and groundwater affecting domestic and municipal drinking water supplies.

114.    Plaintiffs are informed and believe, and thereon allege, that the CPC Facility regularly discharges contaminated wastewater in excess of its 360,000 gallon per day limit.

**C.      Specific Discharge Locations at the CPC Facility**

115.    Plaintiffs are informed and believe, and thereon allege, that Discharge Point EFF-001 is located at Latitude 40 degrees, 18', 30" N, Longitude 121 degrees, 14', 31" W and carries polluted process wastewater into Stover Ditch, a water of the United States and tributary to Lake Almanor within Feather River Hydrologic Unit, Mount Harkness Hydrologic Subarea (No. 518.44), as depicted on inter-agency hydrologic maps prepared by the Department of Water Resources ("DWR") in August 1986.

116.    Plaintiffs are informed and believe, and thereon allege, that the CPC Facility has at least four sources, other than storm water and non-storm water, of effluent that discharge through Discharge Point 001 and to the Stover Ditch a tributary to Lake Almanor: 1) cogeneration boiler blowdown; 2) cooling tower blowdown; 3) clarifier bypasses to ash pond, recycling ponds or gravel pit; and 3) electrostatic precipitator.

117.    Plaintiffs are informed and believe, and thereon allege, that wastewater from the electrostatic precipitator cogeneration plant which contains ash and polymers, is discharged to the unlined Ash Settling Ponds.

118.    Plaintiffs are informed and believe, and thereon allege, that all sawmill and cogeneration plant process wastewater is supposed to be discharged to the Ash Settling Pond.

119.    Plaintiffs are informed and believe, and thereon allege, that the Ash Settling Pond discharges to a drainage ditch approximately 400 feet from Stover Ditch.

120.    The Regional Board has designated this point as the location for effluent monitoring, Discharge EFF-001, under Monitoring and Reporting Program No. R5-2004-0012 and applicable through the NPDES Permit.

121.    Plaintiffs are informed and believe, and thereon allege, that this is the CPC Facility's only declared effluent discharge location.

**D.    Storm Water Discharges from the CPC Facility**

122.    Plaintiffs are informed and believe, and thereon allege, that pursuant to the CPC Facility Chester Sawmill SWPPP, storm water runoff from the cogeneration plant and adjacent areas collects into the "swimming pool," before being pumped to the Ash Settling Pond. An overflow culvert from the swimming pool empties into storm water drainage ditches.

123.    Plaintiffs are informed and believe, and thereon allege, that a consultant's site visit of 4 May 2006 revealed a great deal of wood dust, ash and chips in the swimming pool resulting in marginal water quality. Evidence of a recent overflow was apparent, as the overflow-discharge pipe was about 1/3 full of wood chips and/or ash.

124.    Plaintiffs are informed and believe that on 18 February 2014 during a Regional Board inspection, a sheen on the discharge from the oil/water separator.

125.    Plaintiffs are informed and believe, and thereon allege, that several Annual Reports from 2009 through 2014 for Storm Water Discharges Associated with Industrial Activity record inspections where cloudy water with floating sawdust, wood dust, chips and/or ash was observed in collection areas including the ash settling pond and swimming pool.

126.    Plaintiffs are informed and believe, and thereon allege, that polluted storm water discharges from various areas of the CPC Facility (herein as "Other Discharge Points"), originating as storm water run-off and drainage that does not contact the log deck, but is supposed to be directed via grading and storm drainage ditches.

127.    Plaintiffs are informed and believe, and thereon allege, that storm water runoff from the truck shop and from the east side of the tank farm flows northeast into an undeveloped area between the residential area and Stover Ditch, leaving the CPC Facility during significant rainfall events. Water from the vehicle and equipment wash pad at the north end of the truck shop flows through an oil/water separator before entering drainage ditch B.

128.    Plaintiffs are informed and believe, and thereon allege, that a second oil/water separator is located on the southeast side of the truck shop and collects drainage from the west and south sides of the truck shop. This separator discharges to drainage ditch A.

129.    Plaintiffs are informed and believe, and thereon allege, that during rainfall events, polluted storm water leaves the CPC Facility and eventually discharges from Other Discharge Points into the North Fork Feather River, Stover Ditch, a tributary to Lake Almanor or to groundwater.

130.    Plaintiffs are informed and believe, and thereon allege, that runoff from the main facility area flows to the south where it intersects an eastern flowing drainage to drainage ditch K.

131.    Plaintiffs are informed and believe, and thereon allege, that runoff along the western side of the facility flows southward along the road to the southwest corner of the property, and then flows southward along an access road.

132.    Plaintiffs are informed and believe, and thereon allege, that flow from the southwest drainage leaves the site and flows into waters of the United States.

133.    Plaintiffs are informed and believe, and thereon allege, that during significant rainfall events, polluted storm water leaves the CPC Facility and eventually discharges from Other Discharge Points into the North Fork Feather River or the Stover Ditch, a tributary to Lake Almanor.

134.    Plaintiffs are informed and believe, and thereon allege, that on-site contaminants at the CPC Facility are coming in contact with storm water that discharges to the Stover Ditch, Lake Almanor and the North Fork Feather River.

135.    Plaintiffs are informed and believe, and thereon allege, that storm water discharges at the CPC Facility exceed California Toxics Rule criteria and U.S. Environmental Protection Agency storm water benchmarks, as documented in the CPC Facility's self-monitoring reports and analytical reports from sampling performed by the Regional Board.

136.    Plaintiffs are informed and believe, and thereon allege, that samples exceed standards set for total suspended solids ("TSS"), specific conductance, zinc, iron, copper, chemical oxygen demand ("COD") and pH.  Effluent samples also contained several other contaminants, including: toluene, lead, arsenic, cadmium, nickel, chloroform, benzene and naphthalene, among other pollutants and Listed Chemicals.

/ / /

/ / /

/ / /

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                                      23                           ATA Law Group
                                                                                      www.atalawgroup.com

1

## VI.      CLAIMS FOR RELIEF

2

### FIRST CAUSE OF ACTION
**Discharges in Violation of the NPDES Permit Discharge Limitations**
**and the Clean Water Act,**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
**(Against Defendants Collins Pine Company and DOES 1-25)**

137.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

138.    Within the last five (5) years from the filing of the complaint and continuing through the present, subject to any relevant notice periods referenced above, Defendants, separately and each of them, have engaged in acts and omissions in violation of the CWA and NPDES Permit by unlawfully discharging process wastewater, storm water and non-storm water into the Receiving Waters – waters of the United States –  in violation of CWA § 301(a), 33 U.S.C. §§ 1311(a) 1342; 40 C.F.R. § 126(c)(l).

139.    The CPC Facility's failure to comply with its NPDES Permit violates the Clean Water Act.

140.    The violations described above and below are ongoing, and that the CPC Facility is subject to penalties for all of these violations of the CWA occurring since 1 July 2009.

141.    Violations of the NPDES Permit discharge prohibitions include:

i.    Discharge Prohibition A limits the CPC Facility's discharges to a maximum of 0.36 mgd of process wastewater from and through Discharge Point 001. With flow exceedances and discharges in excess of effluent limitations, the CPC Facility is violating Discharge Prohibition A.

ii.    Discharge Prohibition B of the NPDES Permit prohibits by-bass or overflow of wastes to surface waters except as allowed by Standard Provisions I.G. and I.H. Overflow discharges and by-pass discharges, e.g., the gravel pit, ash pond and ditches in excess of effluent limitations to the Receiving Waters violate the Discharge Prohibition B.

iii.    Discharge Prohibition C prohibits discharge or treatment that creates a nuisance as defined under the California Water Code. As defined in Section 13050 of the California

Water Code, nuisance is "anything that meets all of the following criteria: 1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; 2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, a though the extent of annoyance or damage inflicted upon individuals may be unequal; and 3) occurs during, or as a result of, the treatment or disposal of wastes." Water pollution occurring as a result of discharge of wastes in violation of California Water Code Section 13000 (the section including permitting), such as violations of the CPC's Facility's NPDES Permit, is a public nuisance *per se. Newhall Land and Farming v. Mobile Oil,* 19 Cal. App. 4th 334, 341 (1993). The CPC Facility's polluted Discharges create a nuisance in the community of Chester, California, Lake Almanor, the North Fork Feather River, and their tributaries in that Defendants discharged carcinogens, reproductive toxics and numerous other pollutants in to waters of the United States and surface and ground drinking water sources in violation of Discharge Prohibition C. The pollutants discharged from the CPC Facility are a nuisance as they are injurious to the health and indecent or offensive to the senses, they affect an entire community or a neighborhood, and they occur as a result of the disposal of wastes. The wastewater discharged from the CPC Facility into the Receiving Waters pollutes these waters and harms humans, mammals, birds, fish, and macroinvertebrates either directly, through ingestion, or indirectly, through changes to habitat and food sources. These discharges thus violate Discharge Prohibition C.

    iv.  <u>Discharge Prohibition E</u> prohibits discharges that cause violation of any narrative water quality objective contained in the Basin Plan. *See* NPDES Permit, p. 9. The CPC Facility has discharged pollutants that exceed the applicable effluent limits, or that caused or contributed to the exceedance of water quality standards, as alleged herein, violating narrative water quality objectives contained in the Basin Plan and thus violating Discharge Prohibition E.

Complaint for Declaratory and Injunctive Relief
and Civil Penalties       25       ATA Law Group
www.atalawgroup.com

v. <u>Discharge Prohibition F</u> prohibits the discharges that cause violation of any of any numeric water quality objective standards contained in the Basin Plan. The CPC Facility has discharged pollutants that exceed the applicable effluent limits, or that cause or contribute to the exceedance of water quality standards, and thus the CPC Facility is in violation of Discharge Prohibition F.

vi. <u>Discharge Prohibition H</u> prohibits the discharge of pollutants from causing pollution as defined by Section 13050 of the Water Code. Pollution is defined in Section 13050 of the California Water Code as 'an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects ... [t]he waters for beneficial uses," or facilities which serve these beneficial uses. Cal. Water Code § 13050($l$). The CPC Facility has discharged polluted wastewater with effluent in excess of the set limitations in the NPDES Permit, unreasonably affecting the Receiving Waters for beneficial uses. The CPC Facility's pollution is injurious to the health of the people who use, or would use, Receiving Waters for aesthetic or spiritual purposes, wildlife viewing, wading or swimming or other aquatic recreational activities. The CPC Facility's contaminated discharges are also injurious to animal and aquatic life. Consequently, the CPC Facility's discharges of pollution violate Discharge Prohibition H.

vii. <u>Discharge Prohibition I</u> bars storm water discharges at locations or in manners different from described in the Findings of the NPDES Permit. The CPC Facility discharges storm water to locations and in manners disallowed in the Findings of the NPDES Permit in violation of Discharge Prohibition I. These violations are ongoing and will continue as long as the CPC Facility continues to allow storm water to escape the CPC Facility in violation of the Findings and Discharge Prohibition I of the NPDES Permit.

viii. <u>Discharge Prohibition J</u> prohibits discharge of leachate from wood fuel stockpiles, stored bulk materials, log decks and/or ash stockpiles to surface waters, surface water drainage courses, or groundwater. The CPC facility has discharged storm water and non-storm water carrying process wastewater, wood and ash waste, among other pollutants, directly to the surface waters and groundwater. Further, direct surface water discharges

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                    26                    ATA Law Group
                                                            www.atalawgroup.com

from the CPC Facility occur each time pollutants or wastes recognized as originating from the facility are deposited directly into, or placed where they may pass into, the Receiving Waters from operations and uncovered bulk storage areas which contain leachate from wood fuel stockpiles, log decks or ash stockpiles, among other items. These violations are ongoing and will continue as long as the CPC Facility continues to store wood, logs and ash stockpiles and other items in uncovered areas.

ix. Discharge Prohibition K bars discharge of hazardous or toxic substances (e.g. Listed Chemicals), including water treatment chemicals, solvents, or petroleum products to surface waters or groundwater. The CPC Facility has discharged storm water and non-storm water carrying oil, grease, petroleum and other vehicular and machinery fluids, are discharged directly to the Receiving Waters. Further, direct surface water discharges from the CPC Facility occur each time fugitive dust and any other pollutants or wastes recognized as originating from the facility are deposited directly into the Receiving Waters from vehicles and machinery containing, among other items, oil and grease, petroleum products, and other fugitive automotive and mechanical debris, and from bulk storage areas such as ash piles, log decks, tire piles, wood fuel stockpiles. These violations are ongoing and will continue as long as the CPC Facility continues to operate and store vehicles, machinery, and bulk materials in unenclosed environments.

x. Discharge Prohibition L prohibits the discharge of ash, bark, wood, debris, or any other wastes recognized as originating from the facility to surface waters or drainage courses. The CPC Facility has discharged storm water, non-storm water, and fugitive dust carrying ash, bark and other wood debris directly to surface waters and drainage courses. For example, direct surface water discharges from the CPC Facility occur each time waters, fugitive dust or any other wastes or pollutants recognized as originating from the facility are deposited directly into, or where they may pass into, the Receiving Waters or surface water drainage courses. These discharges can include ash, bark, wood, and other wood and non-wood based debris, in addition to other contaminants. These violations are ongoing and will continue as long as the CPC Facility continues to harbor ash, bark,

1   wood debris and other wastes near the Receiving Waters and water drainage courses.

2   142.   By committing the acts and omissions alleged above, Defendants are subject to an

3   assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the

4   present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the

5   Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

6   143.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

7   Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and

8   the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate

9   remedy at law.

10   WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

11   **SECOND CAUSE OF ACTION**
     **Discharges in Violation of the NPDES Permit Effluent Limitations**

12   **and the Clean Water Act,**
     **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

13   **(Against Defendants Collins Pine Company and DOES 1-25)**

14

15   144.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully

16   set forth herein.

17   145.   Within the last five (5) years from the filing of the complaint and continuing through the

18   present, subject to any relevant notice periods referenced above, Defendants, separately and each of

19   them, have engaged in acts and omissions in violation of the CWA and NPDES Permit by unlawfully

20   discharging process wastewater, storm water and non-storm water into the Receiving Waters – waters of

21   the United States.

22   146.   The CPC Facility has violated and continues to violate the Effluent Limitations for

23   Discharge Point 001 set forth in Section IV.A. of the CPC Facility's NPDES Permit from at least 1 July

24   2009 to the present, as noted by the Regional Board in  Notices of Violation and self-reported

25   exceedances, which are incorporated by reference from the CWA Notice Letter (**Exhibit A**, Attachment

26   C) herein as though fully set forth. Further, other violations for exceedances and failure to monitor are

27   referenced in this complaint and CWA Notice Letter, incorporated herein as though fully set forth

28

Effluent Exceedances. Each exceedance constitutes a violation of the CPC Facility's NPDES Permit and the CWA.

147.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

148.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

**THIRD CAUSE OF ACTION**
**Discharges in Violation of the NPDES Permit Receiving Waters Limitations**
**and the Clean Water Act,**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
**(Against Defendants Collins Pine Company and DOES 1-25)**

149.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

150.    Within the last five (5) years from the filing of the complaint and continuing through the present, subject to any relevant notice periods referenced above, Defendants, separately and each of them, have engaged in acts and omissions in violation of the CWA and NPDES Permit by unlawfully discharging process wastewater, storm water and non-storm water into the Receiving Waters – waters of the United States.

151.    The CPC Facility has violated NPDES Permit limitations related to the Receiving Waters, including A(1), A(2), A(3), A(4), A(5), A(7), A(14), A(15), A(16). The CPC Facility's polluted wastewater, storm water, and non-storm water discharges have violated Receiving Water Limitations set forth in the Facility's NPDES Permit from at least 1 July 2009 with every significant rainfall event and with wastewater and other discharges causing effluent levels unsafe for human, animal, and other aquatic life. *See* **Exhibit A**, Attachment C.

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                                    29                      ATA Law Group
                                                                               www.atalawgroup.com

152.   Pollutants such as metals, oil & grease, and pollutant carrying fugitive dust, negatively affect pH, chemical oxygen demand ("COD"), toxicity, and turbidity, and are known to have adverse effects on aquatic life and their habitats in the Receiving Waters, the Stover Ditch, Lake Almanor, the North Fork Feather River, and their tributaries. These negatively affect Beneficial Uses and constitute violations of the Receiving Water Limitations, the CPC Facility's NPDES Permit and the Clean Water Act.

153.   Process wastewater sampling data collected by CPC Facility and reported in its Annual Monitoring Reports to the Regional Board from 1 July 2009 through 30 June 2014 ("Self-Monitoring Reports"), consistently document wastewater discharges with contaminate concentrations in exceedance of levels known to have detrimental effects on CHW and GCM's use and enjoyment of Lake Almanor, the North Fork Feather River, and their tributaries, with sub-lethal effects on salmonids, and in concentrations violating the Basin Plan's Water Quality Objectives, thereby causing detrimental effects on existing and potential Beneficial Uses or the Basin Plan's narrative and numeric water quality standards.

154.   The CPC Facility's wastewater, storm water, and non-storm water discharges contain elevated concentrations of metals such as copper and lead, which can be acutely toxic and/or have sub-lethal impacts on salmonids and other aquatic life in Lake Almanor, the North Fork Feather River, and their tributaries; that degrade surface water communities and populations including vertebrate, invertebrate, and plant species; that adversely affect the Receiving Waters' beneficial uses in violation of the Basin Plan water quality standards; and that are in violation of applicable water quality standards for a receiving water adopted by the Regional Water Board such as the California Toxics Rule ("CTR") and Basin Plan.

155.   The wastewater, storm water, and non-storm water discharges from CPC Facility that exceed levels known to adversely impact juvenile salmonids, other aquatic species in the Stover Ditch, Lake Almanor, the North Fork Feather River, and their tributaries, or the Receiving Waters' Beneficial Uses constitute violations of Receiving Water Limitations in the NPDES Permit as noted by the Regional Board in Notices of Violation from 1 July 2009 through the present, and are incorporated herein as though fully set forth. Further, other violations are referenced in **Exhibit A**, Attachment C.

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                                          30                              ATA Law Group
                                                                                              www.atalawgroup.com

156.    As demonstrated by CPC Facility's self-reported violations and repeat Notices of Violation, there are, and historically have been, inadequate treatment, monitoring or source control BMPs for copper, iron, lead or other metals and Listed Chemicals at the CPC Facility.

157.    Therefore, wastewater discharges containing equivalent concentrations of metals as reported in CPC Facility's wastewater and Regional Board's water samples from the CPC Facility's Discharge Point 001 testing locations have occurred and are continuing to occur since at least 1 July 2009.

158.    Each discharge in violation of Receiving Water Limitations adversely impacts human health and/or the environment and constitutes a separate and distinct violation of CPC Facility's NPDES Permit and the CWA. These violations are ongoing, and CHW and GCM will include additional violations as information becomes available.

159.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

160.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water in Violation of**
**the Storm Water Permit's Discharge Prohibitions and the Clean Water Act,**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
**(Against Defendants Collins Pine Company and DOES 1-25)**

161.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

162.    Within the last five (5) years from the filing of the complaint and continuing through the present, subject to any relevant notice periods referenced above, Defendants, separately and each of

1   them, have engaged in acts and omissions in violation of the CWA and Storm Water Permit by

2   unlawfully discharging storm water associated with industrial activities in excess of permit limits.

3   163.   With certain limited exceptions, any person who discharges storm water associated with

4   industrial activity in California must comply with the terms of the Storm Water Permit in order to

5   lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1342; and 40 C.F.R. § 122.26(c)(l).

6   Defendants' failure to comply with the Storm Water Permit is a violation of the Clean Water Act. Storm

7   Water Permit, Section C(l), Fact Sheet p. I.; 33 U.S.C. §§ 1311 (a), 1342; 40 C.F.R. § 126(c)(l).

8   164.   Storm water discharges from the CPC Facility constitute discharges of storm water

9   associated with industrial activity because the operation of the CPC Facility's approximately 100-acre

10  site is an industrial activity classified under SIC Codes as described and clarified above, and the

11  industrial activities at the CPC Facility fall within the specified industrial categories in 40 C.F.R. § 122.2

12  (Federal Register, Volume 55 on Pages 48065-66) and in Attachment 1 to the Storm Water Permit.

13  165.   The Storm Water permit regulates storm water discharges from the CPC Facility

14  associated with industrial activity that are not regulated by the CPC Facility's NPDES Permit, including

15  the discharge of storm water containing high levels of zinc, iron, lead and other polluting constituents.

16  166.   Although required to test for copper under the 2008 Multi-Sector General Permit

17  establishing US EPA benchmarks for storm water discharges from SIC Codes 2421, 4911, 4931, the

18  CPC Facility has continuously failed to test for at least one of the known pollutants, copper, generated

19  from its operations from 2009, although it is a known constituent of effluent and storm water discharges,

20  BMPs are required based on the Constituent Study and Pollution Prevention Plan, results from

21  Defendants' industrial processing and activities have consistently been found in violation.

22  167.   Discharge Prohibition A(2) of the Storm Water Permit prohibits storm water discharges

23  that cause or threaten to cause pollution, contamination, or nuisance.

24  168.   Storm water sampling at the CPC Facility demonstrates that storm water discharges

25  contain concentrations of pollutants that cause or threaten to cause pollution, contamination, and/or

26  nuisance in violation of Discharge Prohibition A(2).

27  169.   The CPC Facility's discharge violations of the Storm Water Permit threaten to cause

28  pollution, contamination, or nuisance by, among other things, discharging polluted storm water

containing elevated concentrations of pollutants, including, but not limited to, zinc, iron, lead, copper, COD, pH, and TSS in violation of Discharge Prohibition A(2). *See* Attachment D to **Exhibit A**, Storm Water Exceedances.

170.    These discharges are injurious to health of the surrounding community, including CHW and GCM members, that use and enjoy Lake Almanor, the North Fork Feather River, and their tributaries, as many of these pollutants are known to cause cancer, birth defects, developmental, or reproductive harm, and can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters.

171.    The storm water discharges from the CPC Facility violate Discharge Prohibition A(2) of the Storm Water Permit during and/or following every significant rain event.

172.    Some of the discharge violations of the Storm Water Permit are identified in self-reported exceedances, **Exhibit A**, Storm Water Exceedances, Attachment D, incorporated by reference as though fully set forth herein.

173.    Defendants' violations of Discharge Prohibition (A)(2) of the Storm Water Permit and the CWA are ongoing.

174.    Defendants will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the CPC Facility in violation of Discharge Prohibition (A)(2) of the Storm Water Permit.

175.    Each and every time Defendants discharge contaminated storm water from the CPC Facility in violation of Discharge Prohibition (A)(2) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

176.    By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

177.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate

1   remedy at law.

2          WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

3                                **FIFTH CAUSE OF ACTION**
                        **Discharges of Non-Storm Water in Violation of**
4      **the Storm Water Permit's Discharge Prohibitions and the Clean Water Act,**
                    **33  U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
5                  **(Against Defendants Collins Pine Company and DOES 1-25)**

6

7

8          178.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully

9   set forth herein.

10         179.    Within the last five (5) years from the filing of the complaint and continuing through the

11  present, subject to any relevant notice periods referenced above, Defendants, separately and each of

12  them, have engaged in acts and omissions in violation of the CWA and Storm Water Permit by

13  unlawfully discharging non-storm water into the Receiving Waters – waters of the United States.

14         180.    Discharge Prohibition A(1) of the Storm Water Permit prohibits permittees from

15  discharging materials other than storm water (non-storm water discharges) either directly or indirectly to

16  waters of the United States.

17         181.    Plaintiffs are informed and believe, and thereon allege, that the CPC Facility has been

18  making non-storm water discharges directly to the Receiving Waters – waters of the United States – in

19  violation of Discharge Prohibition A(1). For example, direct non-storm water discharges from the CPC

20  Facility occur each time fugitive dust and other pollutants are deposited directly into the Receiving

21  Waters or drainage courses from uncovered storage, ash, work, and repair areas, containing, among

22  other items, petroleum, wood debris, and metal particles via air deposition.

23         182.    Each time the CPC Facility Owners and/or Operators discharge non-storm water in

24  violation of Discharge Prohibition A(1) of the Storm Water Permit is a separate and distinct violation of

25  the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

26         183.    These violations are ongoing and will continue each time the CPC Facility discharges

27  non-storm water to Receiving Waters from uncovered bulk storage and other areas.

28

184.     In the alternative, discharges of fugitive dust and other pollutants from the CPC Facility to Receiving Waters are unpermitted discharges to waters of the United States in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). *See* Discharge Prohibition A(1).

185.     Each time the CPC Facility discharges pollutants to waters of the United States without a permit in violation of Section 301(a) of the Clean Water Act is a separate and distinct violation. These violations are ongoing and will continue each time the CPC Facility discharges pollutants to Receiving Waters from bulk storage, uncovered loads, emissions of ash, oil/water separators, fugitive dust from ash, disposal of ash, releases from ash pond or gravel pit, soil amendment applications and other areas without a permit.

186.     By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

187.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

**SIXTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water in Violation of**
**the Storm Water Permit's Effluent Limitation (B)(1) and the Clean Water Act,**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
**(Against Defendants Collins Pine Company and DOES 1-25)**

188.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

189.     Within the last five (5) years from the filing of the complaint and continuing through the present, subject to any relevant notice periods referenced above, Defendants, separately and each of them, have engaged in acts and omissions in violation of the CWA and Storm Water Permit by unlawfully discharging storm water in excess of storm water effluent limitations.

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                              35                              ATA Law Group
www.atalawgroup.com

190.     Effluent Limitation (B)(1) requires that storm water discharges from facilities subject to storm water effluent limitations guidelines in Federal regulations (40 C.F.R. Subchapter N) shall not exceed the specified effluent limitations.

191.     As the CPC Facility is classified under the SIC Code(s) described above, and as information available to Plaintiffs indicates that industrial activities at the CPC Facility includes cogeneration electricity production, and sawmill activities, storm water discharges from the CPC Facility are required to comply with federal effluent limitations at 40 C.F.R. §§ 423, 429.

192.     Defendants discharged and continue to discharge storm water from the CPC Facility containing levels of pollutants that do not achieve compliance with the effluent limitations set forth at 40 C.F.R. §§ 442.1 *et seq.*, in violation of Effluent Limitation (B)(1) of the Storm Water Permit, during and/or after every significant rain event or any other storm water discharge from the CPC Facility occurring from 1 July 2009 through the present.

193.     Defendants' violations of Effluent Limitation (B)(1) of the Storm Water Permit and the CWA are ongoing.

194.     Defendants has been and will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the CPC Facility in violation of Effluent Limitation (B)(1) of the Storm Water Permit.

195.     Each and every time Defendants discharge contaminated storm water from the CPC Facility in violation of Effluent Limitation (B)(1) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a), and all violations identified in CWA Notice Letter, Attachment D, are incorporated by reference as though fully set forth herein.

196.     By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

197.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate

1    remedy at law.

2         WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

3    **SEVENTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water in Violation of**
4    **the Storm Water Permit's Effluent Limitation (B)(3) and the Clean Water Act,**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
5    **(Against Defendants Collins Pine Company and DOES 1-25)**

6

7         198.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully

8    set forth herein.

9         199.    Within the last five (5) years from the filing of the complaint and continuing through the

10   present, subject to any relevant notice periods referenced above, Defendants, separately and each of

11   them, have engaged in acts and omissions in violation of the CWA and Storm Water Permit by

12   unlawfully discharging storm water into waters of the United States by failing to implement BMPs that

13   achieve BAT for toxic pollutants and BCT for conventional pollutants.

14

15        200.    Effluent Limitation (B)(3) of the Storm Water Permit requires dischargers to reduce or

16   prevent pollutants associated with industrial activity in storm water discharges through implementation

17   of BMPs that achieve BAT for toxic pollutants and BCT for conventional pollutants.

18        201.    Defendants failed and continue to fail to implement BAT/BCT at the CPC Facility, as

19   storm water discharges from the CPC Facility contain concentrations of pollutants above Federal

20   Effluent Limitations and EPA Benchmarks (including levels of chemical oxygen demand, total

21   suspended solids, iron, copper and zinc), in violation of Effluent Limitation (B)(3) of the Storm Water

22   Permit, during and/or after every significant rain event or any other storm water discharge from the CPC

23   Facility occurring from 1 July 2009 through the present.

24        202.    Attachment D to **Exhibit A**, Storm Water Exceedances, incorporated by reference, lists

25   the dates, from 1 July 2009 through 30 June 2014, on which the CPC Facility has discharged storm

26   water containing amounts and concentrations of metals and other pollutants that exceeded EPA

27   Benchmarks, which demonstrates the CPC Facility has not implemented BMPs that achieve compliance

28   with the BAT/BCT standards.

203.   Defendants' violations of Effluent Limitation (B)(3) of the Storm Water Permit and the CWA are ongoing.

204.   Defendants will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the CPC Facility in violation of Effluent Limitation (B)(3) of the Storm Water Permit.

205.   Each and every time Defendants discharge contaminated storm water from the CPC Facility in violation of Effluent Limitation (B)(3) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

206.   Defendants have been in violation of Effluent Limitation (B)(3) of the Storm Water Permit at the CPC Facility every day from 1 July 2009 to the present.

207.   By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

208.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

## EIGHTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f) (Against Defendants Collins Pine Company and DOES 1-25)

209.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

210.   Within the last five (5) years from the filing of the complaint and continuing through the present, subject to any relevant notice periods referenced above, Defendants, separately and each of

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                                    38                          ATA Law Group
                                                                                   www.atalawgroup.com

them, have engaged in acts and omissions in violation of the CWA and Storm Water Permit by unlawfully discharging storm water in excess of Receiving Water Limitations.

211.    Receiving Water Limitation C(l) of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface water or groundwater that adversely impact human health or the environment.

212.    Defendants have discharged and continue to discharge storm water from the CPC Facility containing levels of pollutants, including chemical oxygen demand, total suspended solids, pH, iron, copper, and zinc, that adversely impact human health and/or the environment in violation of Receiving Water Limitation (C)(1) of the Storm Water Permit during and/or after every significant rain event or any other storm water discharge from the CPC Facility occurring from 1 July 2009 through the present.

213.    Storm water sampling at the CPC Facility also demonstrates that discharges contain concentrations of pollutants that cause or contribute to a violation of an applicable WQS. As described in detail above, and in the attached and incorporated Tables, storm water sampling data collected by CPC and reported in its Annual Reports, document discharges from the CPC Facility with concentrations of metals and other contaminants or pollutants at levels that cause or contribute to exceedances of applicable WQS.

214.    Discharges of polluted storm water from the CPC Facility to Receiving Waters cause or contribute to a violation of Basin Plan WQS for sediments. For example, in violation of the Basin Plan WQS for human health, storm water discharging from the CPC Facility contains, or likely contains in significant amounts, pollutants that bioaccumulate in aquatic life at levels harmful to human health, including metals.

215.    Defendants have discharged and continue to discharge storm water from the CPC Facility to Receiving Waters containing levels of pollutants that cause or contribute to exceedances of water quality standards in violation of Receiving Water Limitation (C)(2) of the Storm Water Permit, during and/or after every significant rain event or other storm water discharge from the CPC Facility occurring from 1 July 2009 through the present.

216.    Defendants' violations of Receiving Water Limitation (C)(1) of the Storm Water Permit

1   and the CWA from the CPC Facility are ongoing.

2       217.    Defendants' violations of Receiving Water Limitation (C)(2) of the Storm Water Permit

3   and the CWA from the CPC Facility are ongoing.

4       218.    Defendants will continue to be in violation of the Storm Water Permit and the CWA each

5   and every time storm water containing pollutants at levels that violate Receiving Water Limitation

6   (C)(1) of the Storm Water Permit discharges from the CPC Facility.

7       219.    Defendants will continue to be in violation of the Storm Water Permit and the CWA each

8   and every time storm water containing pollutants at levels in violation of Receiving Water Limitation

9   (C)(2) of the Storm Water Permit discharges from the CPC Facility.

10      220.    Each and every violation of Receiving Water Limitation (C)(1) or (2) of the Storm Water

11  Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

12      221.    By committing the acts and omissions alleged above, the Defendants are subject to an

13  assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the

14  present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the

15  Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

16      222.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

17  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and

18  the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate

19  remedy at law.

20      WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

21  <u>**NINTH CAUSE OF ACTION**</u>
    **Failure to Adequately Develop, Implement and/or Revise a**
22  **Storm Water Pollution Prevention Plan (SWPPP) in Violation of the Storm Water Permit**
    **and Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
23  **(Against Defendants Collins Pine Company and DOES 1-25)**

24

25      223.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully

26  set forth herein.

27      224.    Within the last five (5) years from the filing of the complaint and continuing through the

28

present, subject to any relevant notice periods referenced above, Defendants, separately and each of them, have engaged in acts and omissions in violation of the CWA and Storm Water Permit by failing to promptly and adequately develop, implement and/or revise the SWPPP.

225.    Section A(1) and Provision E(2) of the Storm Water Permit requires dischargers to have developed and implemented a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all of the requirements of the Storm Water Permit.

226.    Plaintiffs are informed and believe, and thereon allege, that Defendants have been conducting and continue to conduct operations at the CPC Facility with an inadequately developed and/or implemented SWPPP.

227.    Plaintiffs are informed and believe, and thereon allege, that in violation of Sections A(5) and A(6) of the Storm Water Permit, the current SWPPP fails to include an adequate: (1) list of significant materials handled and stored at the site; (2) description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities; (3) description of significant spills and leaks; (4) list of all non-storm water discharges and their sources; and (5) description of locations where soil erosion may occur.  For example,

    i.   the SWPPP fails to list any metals or metal-containing materials, including but not limited to biomass, treated wood, ash, construction and/or demolition debris and other undisclosed prohibited materials;

    ii.  the SWPPP fails to provide an adequate description of potential pollutant sources for pollutants such as iron, lead, nickel, cadmium, zinc, aluminum, arsenic and copper;

    iii. the SWPPP provides inadequate descriptions of non-storm water discharges resulting from air deposition of fugitive dust from biomass fuel inputs, ash, and uncovered bulk material and other storage.

228.    Plaintiffs are informed and believe, and thereon allege, that in violation of Sections A(7) through A(9) and Provision E(2) of the Storm Water Permit, Defendants have failed and continue to fail to revise, evaluate, assess, or modify the SWPPP as necessary to develop and implement adequate BMPs, and to develop and/or implement a SWPPP that contains adequate BMPs to prevent the exposure

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                                             41                    ATA Law Group
                                                                                      www.atalawgroup.com

of pollutant sources to storm water and adequate BMPs to prevent the subsequent discharge of polluted storm water from the CPC Facility.  For example, Defendants failed to update its SWPPP from 2006 until July 2014, despite notice from the Regional Board the SWPPP required updating, modifications or revisions.

229.    Every day Defendants operate the CPC Facility with an inadequately developed, implemented, and/or properly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

230.    Plaintiffs are informed and believe, and thereon allege, that Defendants have been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least 1 July 2009.

231.    Defendants' violations of the Storm Water Permit's SWPPP requirements at the CPC Facility are ongoing.

232.    By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

233.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against the Defendants as set forth hereafter.

## TENTH CAUSE OF ACTION
**Failure to Adequately Develop, Implement, and/or Revise a
Monitoring and Reporting Program in Violation of
the NPDES Permit, the Storm Water Permit, and the
Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)
(Against Defendants Collins Pine Company and DOES 1-25)**

234.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

235.    Within the last five (5) years from the filing of the complaint and continuing through the present, subject to any relevant notice periods referenced above, Defendants, separately and each of them, have engaged in acts and omissions in violation of the CWA and NPDES Permit by failing to adequately develop, implement and/or revise a monitoring and reporting programs as required.

236.    Plaintiffs are informed and believe, and thereon allege, that Defendants have failed to implement and/or revise their Monitoring and Reporting Program ("M&RP") to meet the requirements under both the NPDES Permit and the Storm Water Permit.

237.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed to implement a Toxicity Reduction Evaluation work plan for acute and chronic toxicity monitoring, in violation of the NPDES Permit's requirements.

238.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed to conduct a Constituent Study required under the NPDES Permit and/or implement an adequate M&RP that would account for copper and lead as constituents that have a reasonable potential to cause or contribute to exceedances of water quality objectives, both in violation of the NPDES Permit's requirements.

239.    Plaintiffs are informed and believe, and thereon allege, that the most recent M&RP for the CPC Facility is from the NPDES Permit issued in 2009, a permit that was set to expire on 1 February 2014 but remains in effect in violation of the NPDES Permit's requirements.

240.    Plaintiffs are informed and believe, and thereon allege, that the record of repeat violations and exceedances show the CPC Facility's inability to adapt and change discharge and treatment procedures in order to comply with the NPDES permit. Thus, the Defendants have been and continue to be in violation of the NPDES Permit for failing to adequately develop, implement and revise the M&RP.

241.    Plaintiffs are informed and believe, and thereon allege, that Defendants' failure to conduct adequate sampling, monitoring, and reporting as required by the NPDES Permit demonstrates that they have failed to develop, implement and/or revise an M&RP that complies with the requirements Attachment E and Attachment F(IV) of the NPDES Permit.

242.    Plaintiffs are informed and believe, and thereon allege, that in violation of Storm Water Permit Sections B(5) and B(6) Defendants have failed to analyze storm water samples for copper and other effluents either specifically required or likely to be present in significant quantities.

243.    Plaintiffs are informed and believe, and thereon allege, that also in violation of Storm Water Permit Section B(5), Defendants have failed to collect samples from all discharge locations during the first hour of the first storm event of the wet season because, for example, no samples were collected between 1 July 2010 through 30 July 2011 though significant rain events occurred during that period where sample collection and testing were required.

244.    Plaintiffs are informed and believe, and thereon allege, that in violation of Storm Water Permit Section B(7) Defendants fail to sample storm water discharges from all discharge locations, such as discharges directly from facility storage piles to Receiving Waters.

245.    Defendants' failure to conduct sampling, monitoring, and reporting as required by the Storm Water Permit demonstrates that they have failed to develop, implement and/or revise an M&RP that complies with the requirements of Section B of the Storm Water Permit.

246.    Every day Defendants conduct operations in violation of the specific monitoring and reporting requirements of the NPDES Permit and/or Storm Water Permit, or with an inadequately developed and/or implemented M&RP, is a separate and distinct violation of the NPDES Permit and/or Storm Water Permit and the Clean Water Act.

247.    The Defendants have been in daily and continuous violation of the NPDES Permit and Storm Water Permit's M&RP requirements every day since at least 1 July 2009, and are the violations are ongoing.

248.    By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

249.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and

the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against the Defendants as set forth hereafter.

**ELEVENTH CAUSE OF ACTION**
**Failure to Report as Required by the Storm Water**
**Permit in Violation of the Storm Water Permit and the**
**Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
**(Against Defendants Collins Pine Company and DOES 1-25)**

250.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

251.     Within the last five (5) years from the filing of the complaint and continuing through the present, subject to any relevant notice periods referenced above, Defendants, separately and each of them, have engaged in acts and omissions in violation of the CWA and Storm Water Permit by failing to adequately and completely report storm water discharges as required.

252.     Section B(14) of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by 1 July of each year. Section B(14) requires that the Annual Report include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling results, the laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not perform any activities required, and other information specified in Section B(13).

253.     Since at least July 2009 the Defendants have failed to submit Annual Reports that comply with the Storm Water Permit reporting requirements, including filing incomplete Annual Reports that do not provide the required information.

254.     The Annual Reports for the 2010-2011 Wet Seasons were not submitted as required and/or indicated that the CPC Facility did not have a testing eligible discharge, and accordingly performed no testing.

255.     Other annual reports indicate deficiencies such as: (1) incomplete Annual Comprehensive

1  Site Compliance Evaluations pursuant to Section A(9) of the Storm Water Permit; (2) the SWPPP's
2  BMPs failure to address existing potential pollutant sources; (3) failure to sample all storm water
3  discharge points as required; (4) incorrect reporting that no non-storm water discharges occurred; and
4  (5) the failure to ensure that the SWPPP complies with the Storm Water Permit, or will otherwise be
5  revised to achieve compliance.

6       256.     Plaintiffs are informed and believe, and thereon allege, that indicates that the Defendants'
7  certification is in error and that Defendants have not developed and/or implemented required BMPs or
8  an adequate SWPPP that addresses pollutants and pollutant sources.

9       257.     These failures result in the ongoing discharge of storm water containing pollutant levels
10  in violation of the Storm Water Permit limitations, and prohibited non-storm water.

11       258.     The Storm Water Permit requires a permittee whose discharge exceeds receiving WQS to
12  submit a written report identifying what additional BMPs will be implemented to achieve water quality
13  standards.

14       259.     Defendants have failed to submit the reports required by Receiving Water Limitations
15  C(3) and C(4) of the Storm Water Permit. As such, the CPC Facility Owners and/or Operators are in
16  daily violation of this requirement of the Storm Water Permit.

17       260.     Defendants' violations of the Reporting Requirements of the Storm Water Permit and the
18  CWA are ongoing.

19       261.     Every day the CPC Facility Owners and/or Operators operate the CPC Facility without
20  reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water
21  Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

22       262.     Defendants have been in daily and continuous violation of the Storm Water Permit's
23  reporting requirements every day since at least 1 July 2009.

24       263.     By committing the acts and omissions alleged above, the Defendants are subject to an
25  assessment of civil penalties for each and every violation of the CWA occurring from 1 July 2009 to the
26  present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the
27  Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

28       264.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against the Defendants as set forth hereafter.

**TWELFTH CAUSE OF ACTION**
**Violations of Proposition 65**
**California Health and Safety Code § 25249.5 *et seq.***
**(Against Defendants Collins Pine Company and DOES 1-25)**

265.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

266.    Within the last one (1) year from the filing of the complaint and continuing through the present, subject to any relevant notice periods referenced above, Defendants, separately and each of them, have engaged in acts and omissions in violation of the Safe Drinking Water and Toxic Enforcement Act of 1986 by discharging, releasing or emitting chemicals listed under Prop. 65 into sources of drinking water directly or to locations where the chemicals pass or probably will pass into drinking water sources.

267.    The CPC Facility and Defendants have unlawfully discharged and continue to unlawfully discharge Proposition 65 Listed Chemicals, below, from the CPC Facility into existing and/or potential drinking water sources, to wit - Stover Ditch, Lake Almanor and/or the North Fork Feather River ("source(s) of drinking water").

268.    On November 4, 2014, Plaintiffs sent the Prop. 65 Notice Letter to Defendants and incorporates the same by reference, as though fully set forth herein.

269.    The CPC Facility is allowed to discharge 360,000 gallons per day (or .36 million gallons per day) of effluent originating from industrial operations at the CPC Facility and that the CPC Facility indicates consistently violates this significant volumetric effluent limit.

270.    Pollution and chemicals entering drinking water sources via air deposition, as a result of Defendants' acts or omissions, is also recognized as a significant cause of the degradation and quality of the sources of drinking water.

271.    Plaintiffs are informed and believe, and thereon allege, that even without volumetric

effluent exceedances and aerial deposition, and definitely with those, the CPC Facility knowingly emitted, discharged or released a significant amount of Proposition 65 Listed Chemicals into sources of drinking water, including groundwater.

272.   Defendants' discharges/releases of process wastewater, storm water and non-storm water, deposition of contaminated ash as soil amendment and emissions of chemicals to existing or potential drinking water sources, like Stover Ditch, Lake Almanor, the North Fork Feather River, and their tributaries, pose carcinogenic and reproductive toxicity threats to the public.

273.   These discharges further the purpose or operation of Defendants' business or are expressly or implicitly authorized by Defendant, and are therefore in the course of doing Defendants' business.

274.   Defendants' discharges, releases, emissions, disposals and discard include chemicals listed under Proposition 65 and are prohibited from being discharged into a source of drinking water, or tributary thereof, or placed where they pass or probably will pass into a drinking water source. Defendants' discharge, release, emission, disposal and discard of the Listed Chemicals, below, constitute violations of Proposition 65. The violations of Proposition 65 alleged here include past and ongoing emissions and/or discharges or releases of:

- Lead and Lead Compounds;
- Dichloromethane (Methylene Chloride);
- Carbon Disulfide;
- Toluene;
- Arsenic (inorganic arsenic compounds and inorganic oxides);
- Cadmium (and cadmium compounds);
- Nickel (metallic and nickel compounds);
- Beryllium (and beryllium compounds),
- Chloroform;
- Benzene;
- Napthalene,
- Di(2-ethylhexyl)phthalate;
- 4-(N-Nitrosomethylamino)-1-(3-pyridyl)1-butanone;
- Residual (heavy) fuel oils;
- Soot, tars, and mineral oils; and
- Compounds containing Selenium, Vanadium, and/or Cobalt.

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                              48                        ATA Law Group
                                                                           www.atalawgroup.com

275.    All of the chemicals listed above have been on the Proposition 65 list longer than twenty months after the date that each were originally listed pursuant to Proposition 65 protocols.  Health & Safety Code § 25249.9(a).

276.    The above-listed Proposition 65 reproductive or developmental toxics and/or carcinogens ("Listed Chemicals") have been knowingly emitted, deposited, discharged or released, continue to be knowingly emitted, deposited, released or discharged, and are likely to continue to be knowingly emitted, released or discharged in the future by Defendants.

277.    Plaintiffs are informed and believe, and thereon allege, that Defendants are knowingly discharging, releasing, disposing, discarding or emitting the above referenced chemicals from the CPC Facility into Stover Ditch, Lake Almanor and/or the North Fork Feather River.

278.    The Central Valley Regional Water Quality Control Board has so designated the North Fork Feather River, and its tributaries Lake Almanor and Stover Ditch, as sources of drinking water.

279.    Plaintiffs are informed and believe, and thereon allege, that Defendants are knowingly allowing storm water contaminated with the Listed Chemicals to discharge from the CPC Facility into existing and potential sources of drinking water.

280.    Defendants, through the operations of the CPC Facility, violated, violates and threatens to violate the discharge/release prohibition contained in Health & Safety Code § 25249.5.

281.    Defendants have been violating, continue to violate and threaten to violate by knowingly discharging, depositing, releasing and/or emitting the Listed Chemicals from its CPC Facility into surface and ground waters, or onto land where the Listed Chemicals pass, have passed or probably will pass into sources of drinking water for a number of years, and at least since 2011.

282.    In the absence of equitable relief, Defendants will continue to discharge or release chemicals that cause cancer and birth defects into Receiving Waters, which creates a substantial risk of irreparable contamination to these protected sources of drinking water.

283.    By committing the acts alleged in this Complaint, Defendants at all times relevant to this action, and continuing through the present, have violated California health & Safety Code §25249.5 by, in the course of doing business, knowingly discharging, releasing, disposing, discarding and/or emitting chemicals known to the State of California to cause cancer or reproductive toxicity into drinking water

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                                                    49                                    ATA Law Group
                                                                                                    www.atalawgroup.com

sources or into or onto land where such chemical passes or probably will pass into any drinking water source.

284.    By the above-described acts, Defendants have violated H&S Code § 25249.5 and are therefore subject to preliminary and permanent injunctions ordering Defendants to stop violating Proposition 65, to require improvements, modifications and monitoring to ensure all present and future discharges, releases, emissions, disposals and discards will not allow chemicals known to the State of California to cause cancer or reproductive toxicity to enter drinking water sources or be placed into or onto land where such chemicals will pass or probably will pass into any source of drinking water.

285.    An Action for injunctive relief under Proposition 65 is specifically authorized by Health & Safety Code § 25249.7 against Defendants for violating or threatening to violate Section 25249.5.

286.    In the absence of preliminary and then permanent injunctive relief, Defendants will continue to create a substantial risk of irreparable injury by continuing to cause Plaintiffs, residents of Chester, CA and surrounding and downstream communities to be involuntarily, unknowingly and unwittingly exposed to the Listed Chemicals in their drinking water as a result of Defendants' acts and omissions.

287.    Continuing commission by Defendants of the acts and omissions alleged above will irreparably harm the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against the Defendants as set forth hereafter.

## VII.    RELIEF REQUESTED

1.    Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

a.    A Court order declaring Defendants to have violated and to be in violation of the NPDES Permit, the Storm Water Permit, Proposition 65 and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342, for their unlawful discharges of pollutants and violations of the substantive and procedural requirements of the NPDES Permit, the Storm Water Permit, Proposition 65, and the CWA;

b.    A Court order enjoining Defendants from violating the substantive and procedural requirements of the NPDES Permit, the Storm Water Permit, Proposition 65 discharge prohibition, and

Complaint for Declaratory and Injunctive Relief
and Civil Penalties                                     50                          ATA Law Group
                                                                                    www.atalawgroup.com

1  Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

2      c.  A Court order assessing civil monetary penalties for each violation of the CWA at

3  $37,500 per day per violation for violations occurring since 1 July 2009, as permitted by 33 U.S.C. §

4  1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

5      d.  A Court order assessing civil monetary penalties for each violation of Proposition 65 at

6  $2,500 per day per violation, as permitted by Health and Safety Code § 25249.5, et seq.;

7      e.  A Court order awarding Plaintiffs their reasonable costs of suit, including attorney,

8  witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C.

9  § 1365(d); California Code of Civil Procedure § 1021.5, and any other applicable provisions of law; and

10      f.  Any other relief as this Court may deem equitable, just and appropriate.

11

12  Dated: 8 January 2015                    Respectfully submitted,

13

14

15                                          Matthew C. Maclear
                                            Jason Flanders
16                                          AQUA TERRA AERIS LAW GROUP
                                            Attorneys for Plaintiffs
17                                          COMMUNITY HEALTH WATCH and
                                            GLOBAL COMMUNITY MONITOR

18

19

20

21

22

23

24

25

26

27

28